## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>                  v.<br><br>2,000,010.00 USDT from the virtual currency address ending eEbB, with an approximate value of $2,000,010.00;<br><br>1,500,010.00 USDT from the virtual currency address ending F177, with an approximate value of $1,500,010.00;<br><br>8,650,647.18 USDT from the virtual currency address ending 10cc, with an approximate value of $8,650,647.18.<br><br>                              Defendants. | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_**<br><br>Civil Action No.:  1:25-CV-1241 (MAD/PJE) |

The United States of America (the "Plaintiff") brings this verified complaint for forfeiture _in rem_ against the above-captioned property and alleges as follows:

### NATURE OF THE ACTION

1.      This action _in rem_ is brought against the above-captioned property pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C) as the proceeds of, and property involved in, violations of Title 18, United States Code, Sections 1343 (wire fraud) and 1956(a)(1)(A)(i) (money laundering) and 1957 (engaging in monetary transactions greater than $10,000 in property derived from specified unlawful activity).  The matter is also brought pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule G").

## FORFEITURE AUTHORITY

2.      Title 18, United States Code, Section 981(a)(1)(A) provides for the forfeiture of: "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of [Title 18], or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A).

3.      Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of: "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).

## THE PARTIES

4.      The Plaintiff is the United States of America.

5.      The defendants (the "Defendant Cryptocurrency") consist of Tether cryptocurrency (USDT) previously associated with the following unhosted virtual currency addresses (together, the "Target Wallets"):

   a)      Target Wallet 1 (0xBbd0E3c8F09FA8B8CF002b569DbFf5a0813dF177): USDT 1,500,010.00;

   b)      Target Wallet 2 (0xEB9478d602166D3dD9A29C7C45b1287c16EA10cc): USDT 8,650,647.177773; and

   c)      Target Wallet 3 (0x87370eC2E2686952e4dFbcDdE5641f03956CeEbB): USDT 2,000,010.00.

6.      The Defendant Cryptocurrency is presently in the custody of the United States of America and has been since on or about April 16, 2025. It was seized pursuant to a seizure warrant issued by this Court on February 11, 2025 in Case No. 1:22-MJ-565(DJS).

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, Section 1345 and 1355.  Section 1345 provides district courts with "original jurisdiction of all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345.  Section 1355(a) provides district courts with "original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." 28 U.S.C. § 1355(a).

8.    This Court has *in rem* jurisdiction over the Defendant Cryptocurrency and venue is properly situated in this district pursuant to Title 28, United States Code, Section 1355(b)(1)(A), which provides that a forfeiture action or proceeding "may be brought in . . . the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A).

9.    Venue is also properly situated in this district pursuant to Title 28, United States Code, Section 1395(b), which provides that "[a] civil proceeding for forfeiture of property may be prosecuted in any district where such property is found." 28 U.S.C. § 1395(b).

## FACTS

### *Background on Cryptocurrency*

10.    Cryptocurrency, or virtual currency, is a decentralized, peer-to-peer form of electronic currency.  Cryptocurrency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value.  Unlike "fiat currency," like the U.S. dollar and the Euro, cryptocurrency is generally not issued by any central governmental authority and functions only by agreement within the community of

users of that currency. Cryptocurrency can be quickly transmitted directly between parties and across national borders, without the need for a facilitating third party or financial institution.

11.    There are many cryptocurrency networks in use. Some of the most popular of these networks include Bitcoin and Ethereum. Each of those networks utilizes its own decentralized public ledger called a blockchain to record all of the transactions associated with that network.

12.    In an Ethereum transaction, Ether (ETH), the native cryptocurrency on the Ethereum blockchain, is sent from one Ethereum address to another. An Ethereum address is somewhat analogous to a bank account number and is represented as a 44-character-long string of letters and numbers beginning with 0x. Each Ethereum address is controlled by a unique corresponding private key, which is a cryptographic equivalent of a password or pin needed to send funds from an address. Only the holder of an address's private key can authorize any transfers of Ethereum from that address to other Ethereum addresses. Users can operate multiple Ethereum addresses at any given time, with the possibility of using a unique Ethereum address for each transaction.

13.    In a Bitcoin transaction, Bitcoin (BTC), the native cryptocurrency on the Bitcoin blockchain, is sent from one or more Bitcoin addresses to one or more Bitcoin addresses. A Bitcoin address is represented by 25 to 35 character-long string of letters and numbers. Bitcoin addresses are also controlled by a private key which allows only the holder to authorize transactions from Bitcoin addresses. Bitcoin users can operate multiple addresses at any given time, with the possibility of using a unique Bitcoin address for each transaction.

14.    To transfer Bitcoin or Ethereum to another address, the sender transmits a transaction announcement, which is cryptographically signed with the sender's private key, across the Bitcoin or Ethereum peer-to-peer network, respectively. In general, the amount of

cryptocurrency to be sent, the address of the receiving party, and the sender's private key are the only pieces of information needed to complete the transaction; therefore, a Bitcoin or Ethereum address by itself rarely reflects any identifying information. As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in the transaction itself. Once the sender's transaction announcement is verified by the network, the transaction is added to the Bitcoin or Ethereum blockchain. The Bitcoin and Ethereum blockchains, respectively, log every Bitcoin and Ethereum address that has ever been involved in a transaction and maintain records of every transaction for each Bitcoin and Ethereum address.

15.    The Ethereum network also allows for other items of value, such as tokens, to be stored and transacted between Ethereum addresses. The rules governing the creation and functionality of these items of value are defined by programs stored on the blockchain called smart contracts. Any Ethereum user can create a smart contract and deploy it on the Ethereum blockchain. USDT and USDC, described in more detail below, are two common tokens that are transacted on the Ethereum blockchain. Transactions involving these tokens are governed by their associated smart contracts. Like all other transactions on the Ethereum blockchain, transactions involving tokens such as USDT and USDC are recorded on the blockchain. These transactions also require some amount of ETH as a blockchain transaction fee.

16.    To acquire cryptocurrency, a typical user will purchase it from a cryptocurrency exchange. A cryptocurrency exchange is a business that allows customers to trade cryptocurrencies for other forms of value, such as conventional fiat money. Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies). Cryptocurrency exchanges

doing business in the United States are regulated and must collect certain identifying information about their customers.

17.     While the identity of a cryptocurrency address owner is generally anonymous (unless the owner opts to make information about the owner's address publicly available), analysis of the blockchain can often be used to identify the owner of a particular address.  Since blockchains serve as searchable public ledgers of every transaction on the corresponding cryptocurrency network, investigators may trace transactions to exchanges.  Because those exchanges generally collect identifying information about their customers, subpoenas or other appropriate legal process submitted to these exchanges can, in some instances, reveal the true identity of an individual responsible for a cryptocurrency transaction.

18.     A cryptocurrency wallet is used to store cryptocurrency and can control cryptocurrency addresses associated with multiple blockchains.  The wallet interfaces with the blockchain and uses private keys to restrict access to spending the various types of cryptocurrency and tokens stored within the wallet.  Cryptocurrency exchanges and users of cryptocurrencies store and transact such funds in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on electronic devices, including computer and mobile devices (*e.g.*, smart phones or tablets), or at web sites that users can access via a computer, smart phone, or any device that can search the Internet.

19.     The most common cryptocurrency exchanges are centralized custodial exchanges, which are controlled by a single entity that holds the private keys to all wallets associated with the exchange.  This is similar to a customer depositing funds into a bank where the bank controls access to the vaults and the customer trusts the bank to properly credit their account. A cryptocurrency exchange customer entrusts the cryptocurrency exchange with their deposited cryptocurrency and expects it to be properly credited to their account.  Centralized custodial cryptocurrency exchanges typically create one or more unique deposit addresses for each customer account.  Because these addresses are associated with a specific account, funds deposited to the addresses can be automatically credited to the associated customer's account.

20.     Software that allows a user to perform specific tasks on a computer, such as a word processor or web browser, is called an application or "app."  Apps for desktop or laptop computers are typically called desktop applications and those for mobile devices such as tablets and smartphones are typically called mobile apps or simply apps.  The most common operating systems for mobile devices are Android and iOS.  These two operating systems both offer native platforms, Google Play Store and Apple App Store, respectively, where apps have that passed some level of security and functionality screening can be downloaded.  Many cryptocurrency exchanges offer mobile apps so that their services can be easily utilized from mobile devices.  Both the Google Play Store and App Store offer apps for well-known cryptocurrency exchanges including Coinbase, Crypto.com, Kraken, Gemini, Shakepay, and Delta Exchange.

21.     Stablecoins are a type of virtual currency whose value is pegged to a commodity's price (such as gold), a fiat currency (such as the U.S. dollar), or a different virtual currency.  For example, USDC is a stablecoin pegged to the U.S. dollar.  Stablecoins achieve their price stability

via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

22.     USDT, also sometimes referred to as Tether tokens, is a cryptocurrency pegged to the U.S. dollar.  Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT tokens.

23.     Shakepay is a legitimate cryptocurrency exchange based in Montreal, Canada that allows customers to purchase the cryptocurrency Bitcoin.  An app for the legitimate exchange Shakepay is available for download using the Apple App Store and the Google Play Store.

*Overview of the Scheme*

24.     In 2022, the Federal Bureau of Investigation (FBI) began investigating a fraud scheme involving the use of fraudulent websites and apps designed to mimic Shakepay.

25.     Since at least February 2022, multiple victims of the scheme were convinced to transfer custody of their cryptocurrency to the perpetrators under the guise of customer deposits to this cryptocurrency exchange.  However, the victims were actually given a link to a fraudulent imposter exchange called Shakepay**EX**.  The victims later discovered that they were unable to withdraw all of the funds that they deposited to their "accounts," and that they were being extorted for more cryptocurrency when attempting to withdraw their funds.

26.     There are ten victims identified and interviewed by the FBI.  For the period from March 31, 2022 to December 31, 2022, these ten victims transferred approximately $10,308,950 to three wallets (the Target Wallets) associated with a fraudulent ShakepayEX cryptocurrency app. Below are descriptions of what occurred as to five such victims.

### *Victim-1*

27.    Victim-1, a resident of this District, was defrauded of cryptocurrency estimated to be worth more than $1,600,000.   In March 2022, she received a text message from an individual who identified himself as Jack Liu.  Liu claimed that he had met Victim-1 at a conference in New York City.  The victim believed that she had never met Liu previously.  Still, she and Liu began chatting about their private lives. She became attracted to Liu and developed a relationship.  She noted that Liu seemed to have extensive knowledge of stocks and investments.  She exchanged a number of messages with Liu related to both investing and personal matters.  Liu communicated with her in Mandarin Chinese.

28.    A few months later, Liu suggested that Victim-1 invest in cryptocurrency.  Liu told her that he had made a significant profit investing in cryptocurrency and that he could walk her through how to do it.  He instructed her to open an account at the U.S.-based cryptocurrency exchanges Coinbase and Gemini.  Liu then told her to transfer money from her bank account to her Coinbase and Gemini accounts via wire transfer.  Liu also requested that she communicate with him on Telegram, an end-to-end encrypted mobile communication platform, rather than using phone text messages.

29.    Liu then instructed her to download a cryptocurrency app called ShakepayEX to her mobile phone directly from a URL that Liu provided: https://m.shakepayex[.]com/.  She downloaded the app and then used it to create an account by providing her email address, phone number, and a photo of her driver's license.  Liu walked her step-by-step through the entire process in a text chat.

30.    After Victim-1 had created an account, Liu told her to use the money in her Coinbase and Gemini accounts to buy cryptocurrency and transfer these funds to her ShakepayEX

account.  Liu provided her with a ShakepayEX deposit addresses. In May 2022, she wired $100,000 into a ShakepayEX wallet address.

31.     Later on, Liu claimed that a $100,000 investment barely generated any profit, and that she needed at least $500,000 in her account to generate more sizable returns.  Eventually, Liu pressured Victim-1 to invest all of her funds from her 401K account and her life savings into ShakepayEX.

32.     After moving all of her savings to the ShakepayEX app, Victim-1 became uneasy and attempted to withdraw cryptocurrency from her ShakepayEX account using the app.  She was unsuccessful.  She contacted Liu and was told that she was required to pay a $200,000 "tax penalty fee" to withdraw any funds. At that point she decided to contact her local police department and eventually the FBI.

33.     Through blockchain analysis and a review of business records and other information, the FBI subsequently traced the movement of cryptocurrency from Victim-1's Coinbase and Gemini Accounts to/through the app based on the link provided by Liu.  From there, the cryptocurrency was converted to USDT and then transferred through at least two layers of intermediary cryptocurrency wallets, with 37,030 USDT ultimately ending up, in part, in Target Wallet 1.  Furthermore, tracing of funds from Target Wallet 1 show deposits of 2,000,000 USDT and 2,000,000 USDT to Target Wallet 2 and Target Wallet 3, respectively.

### Victim-2

34.     Victim-2 was defrauded of cryptocurrency estimated to be worth more than $3,900,000.  On or about April 2, 2022, Victim-2 received a text message from an individual who identified himself as Jack Liu.  Liu asked her if she was a Chinese teacher.  Victim-2 ignored Liu's message initially.  A few days later, however, she replied to Liu and began chatting about their

private lives.  She became attracted to Liu, complained about her marriage, and developed a relationship.  She noted that Liu seemed to have extensive knowledge of stocks and investments. Liu communicated with Victim-2 in Mandarin Chinese.

35.    Later in April 2022, Liu suggested that Victim-2 invest in cryptocurrency.  Liu told her that he had made a significant profit investing in cryptocurrency and that he could walk her through how to do it.  He instructed her to open an account at each of the cryptocurrency exchanges:  Kraken, Crypto.com, and Gemini. Liu then told her to transfer money from her bank account to her Kraken, Crypto, and Gemini accounts via wire transfer.  Liu also requested that she communicate with him using Telegram rather than through phone text messages.

36.    Liu then instructed her to download a cryptocurrency app called ShakepayEX to her mobile phone directly from https://m.shakepayex[.]com/.  She downloaded the app and then used it to create an account by providing her email address, phone number, and a photo of her driver's license.  Liu walked her step-by-step through the entire process via text chat.

37.    After she had created an account, Liu told her to use the money in her Kraken, Crypto, and Gemini accounts to buy cryptocurrency and transfer these funds to her ShakepayEX account.  Liu provided her with ShakepayEX deposit addresses.  Victim-2 made withdrawals from a retirement account and invested approximately $3,900,000.

38.    After moving most of her funds to the ShakepayEX app, she decided to withdraw some of the money.  The attempt to withdraw cryptocurrency from her ShakepayEX account using the app was unsuccessful. She contacted Liu and was told that she was required to pay a "tax penalty fee" to withdraw any funds.  At that point, she contacted the FBI.

39.    Through blockchain analysis and a review of business records and other information, the FBI subsequently traced the movement of cryptocurrency from the victim's

Kraken, Crypto.com, and Gemini Accounts to/through the app based on the link provided by Liu. From there, the cryptocurrency was converted to USDT and then transferred through at least two layers of intermediary cryptocurrency wallets, with 218,100 USDT ultimately ending up, in part, at Target Wallet 1. Furthermore, tracing of funds from Target Wallet 1 show deposits of 2,000,000 USDT and 2,000,000 USDT to Target Wallet 2 and Target Wallet 3, respectively.

*Victim-3*

40.    Victim-3 was defrauded of cryptocurrency estimated to be worth more than $690,000. In July 2022, Victim-3 received a text message from an individual who identified himself as Wenxuan Wang. She replied to Wang and began chatting about their private lives. Wang introduced himself as a successful employee for a venture capital firm in Boston, Massachusetts. Wang communicated with Victim-3 in Mandarin Chinese.

41.    In August 2022, Wang persuaded Victim-3 invest in cryptocurrency. Wang instructed her to open an account at Crypto.com. Wang then told her to transfer money from her bank account to her Crypto.com account via wire transfer. Wang also requested that she communicate with him on Telegram.

42.    Wang then instructed Victim-3 to download a cryptocurrency app called ShakepayEX to her mobile phone directly from https://m.shakepayex[.]com/. She downloaded the app and then used it to create an account by providing her email address, phone number, and a photo of her driver's license. Wang provided exact steps on how to set up an account via text chat.

43.    After Victim-3 had created an account, Wang told her to use the money in her Crypto.com account to buy cryptocurrency and transfer these funds to her ShakepayEX account. Wang provided her with a deposit address for ShakepayEX.

44.     After moving most of her funds to the ShakepayEX app, Victim-3 decided to withdraw some of the money.  The attempt to withdraw cryptocurrency from her ShakepayEX account using the app was unsuccessful.  Wang explained that she will need to pay an additional tax penalty fee to withdraw the funds.  Victim-3 believed that something was not right and decided to contact the FBI.

45.     Through blockchain analysis and a review of business records and other information, the FBI subsequently traced the movement of cryptocurrency from the victim's Crypto.com account to/through the app based on the link provided by Wang.  From there, the cryptocurrency was converted to USDT and then transferred through at least two layers of intermediary cryptocurrency wallets, with 40,000 USDT ultimately ending up, in part, at Target Wallet 1.  Furthermore, tracing of funds from Target Wallet 1 show deposits of 2,000,000 USDT and 2,000,000 USDT to Target Wallet 2 and Target Wallet 3, respectively.

### *Victim-4*

46.     Victim-4 was defrauded of cryptocurrency estimated to be worth more than $390,000.  In January 2022, Victim-4 received a text message from an individual who identified himself as Daihao Qu.  She replied to Qu and began chatting about their private lives.  Qu introduced himself as a successful employee for a venture capital firm in San Francisco, California. Qu communicated with her in Mandarin Chinese.

47.     In April 2022, Qu persuaded Victim-4 to invest in cryptocurrency.  Qu instructed her to open an account at Crypto.com.  Qu then told her to transfer money from her bank account to her Crypto.com account via wire transfer.

48.     Qu then instructed Victim-4 to download a cryptocurrency app called ShakepayEX to her mobile phone directly from https://m.shakepayex[.]com/.  She downloaded the app and then

used it to create an account by providing her email address, phone number, and a photo of her driver's license. Qu provided exact steps on how to set up an account via text chat.

49.    After Victim-4 had created an account, Qu told her to use the money in her Crypto.com account to buy cryptocurrency and transfer these funds to her ShakepayEX account. Wang provided her with a deposit address for ShakepayEX.

50.    After moving most of her funds to the ShakepayEX app, Victim-4 was approached by another individual, who identified himself as Abel. She realized that Abel used the same approach as Qu, such as by presenting himself as a successful employee for a firm in San Francisco. She identified the same script being used in the chat app. Victim-4 then contacted the FBI.

51.    Through blockchain analysis and a review of business records and other information, the FBI subsequently traced the movement of cryptocurrency from the Victim-4's Crypto.com account to/through the app based on the link provided by Qu. From there, the cryptocurrency was converted to USDT and then transferred through at least two layers of intermediary cryptocurrency wallets, with 45,075 USDT ultimately ending up, in part, at Target Wallet 1. Furthermore, tracing of funds from Target Wallet 1 show deposits of 2,000,000 USDT and 2,000,000 USDT to Target Wallet 2 and Target Wallet 3, respectively.

### *Victim-5*

52.    Victim-5 was defrauded of cryptocurrency estimated to be worth more than $1,800,000. In April 2022, Victim-5 received a text message from a group of individuals who presented themselves as investment advisors. She replied to the group and was persuaded make multiple deposits to the investment opportunity. The communications with her were in Mandarin Chinese.

53.    Victim-5 was instructed to open an account at Crypto.com.  The group then told her to transfer money from her bank account to her Crypto.com account via wire transfer.

54.    The group then instructed Victim-5 to download a cryptocurrency app called ShakepayEX to her mobile phone directly from https://m.shakepayex[.]com/.    Victim-5 downloaded the app and then used it to create an account by providing her email address, phone number, and a photo of her driver's license.

55.    After Victim-5 had created an account, the group told her to use the money in her Crypto.com account to buy cryptocurrency and transfer these funds to her ShakepayEX account.

56.    After moving most of her funds to the ShakepayEX app, she decided to withdraw some of the money.  The attempt to withdraw cryptocurrency from her ShakepayEX account using the app was unsuccessful.  The group explained that she will need to pay an additional tax penalty fee to withdraw the funds.  Victim-5 then contacted the FBI.

57.    Through blockchain analysis and a review of business records and other information, the FBI subsequently traced the movement of cryptocurrency from the Victim-5's Crypto.com account to/through the app based on the link provided by the group.  From there, the cryptocurrency was converted to USDT and then transferred through at least two layers of intermediary cryptocurrency wallets, with 49,000 USDT ultimately ending up, in part, at Target Wallet 1.  Furthermore, tracing of funds from Target Wallet 1 show deposits of 2,000,000 USDT and 2,000,000 USDT to Target Wallet 2 and Target Wallet 3, respectively.

## CONCLUSION

58.    The facts set forth above support a reasonable belief that the government will be able to meet its burden of proof at trial.

WHEREFORE, pursuant to Supplemental Rule G, the Plaintiff, the United States of America, respectfully requests that the Court:

(1)     Issue a Warrant of Arrest *in Rem*, in the form submitted with this Complaint;

(2)     Direct any person having any claim to the Defendant Cryptocurrency to file and serve their Verified Claims and Answers as required by 18 U.S.C. § 983(a)(4) and Supplemental Rule G;

(3)     Enter judgment declaring the Defendant Cryptocurrency to be forfeited and condemned to the use and benefit of the United States; and

(4)     Award such other and further relief to the United States as it deems proper and just.

Dated: September 5, 2025

JOHN A. SARCONE III
Acting United States Attorney

By:    */s/ Joshua R. Rosenthal*
       Joshua R. Rosenthal
       Assistant United States Attorney
       Bar Roll No. 700730

## **VERIFICATION**

I, Giedrius Knysas, hereby depose and state:

I am a Special Agent with the Federal Bureau of Investigation.  I have read the foregoing Complaint for Forfeiture *in Rem* and assert that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me as well as on information received from other law enforcement officers.

I hereby verify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of September, 2025.

Giedrius Knysas
Special Agent
Federal Bureau of Investigation